UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                        |     |                              |
|----------------------------------------|-----|------------------------------|
| COLEE ASIA,                            | *   |                              |
|                                        | *   |                              |
| Plaintiff,                             | *   |                              |
|                                        | *   |                              |
| v.                                     | *   |                              |
|                                        | *   | Civil Action No. 13-11958-MGM |
| RES-CARE INC. and                      | *   |                              |
| ALUTIIQ EDUCATION & TRAINING, LLC.     | *   |                              |
|                                        | *   |                              |
| Defendants.                            | *   |                              |
|                                        | *   |                              |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 35 and 40)

November 14, 2014

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

Colee Asia ("Plaintiff") filed a one-count complaint alleging that Defendants, Res-Care Inc.

("ResCare") and Alutiiq Education & Training, LLC ("Alutiiq"), violated MASS. GEN. LAWS ch. 119,

§ 51A[1] ("ch. 119") by retaliating against her after she reported a student's allegations of physical

abuse to the Massachusetts Department of Children and Families ("DCF"), and subsequently to the

---

[1] The relevant text of the statute is as follows:
   (a) A mandated reporter who, in his professional capacity, has reasonable cause to believe that a child is suffering physical or emotional injury resulting from: (i) abuse inflicted upon him which causes harm or substantial risk of harm to the child's health or welfare. . .shall immediately communicate with the Massachusetts Department of Children and Families ("DCF") orally and, within 48 hours, shall file a written report with the department detailing the suspected abuse or neglect...A mandated reporter may, in addition to filing a report under this section, contact local law enforcement authorities or the child advocate about the suspected abuse or neglect. . . (h) No employer shall discharge, discriminate or retaliate against a mandated reporter who, in good faith, files a report under this section, testifies or is about to testify in any proceeding involving child abuse or neglect. Any employer who discharges, discriminates or retaliates against that mandated reporter shall be liable to the mandated reporter for treble damages, costs and attorney's fees.
MASS. GEN. LAWS ch. 119, § 51A

Chicopee Police Department ("Chicopee Police"). Defendants deny all material allegations and have moved for summary judgment.[2]

For the reasons set forth below, the court denies both Defendants' motions for summary judgment in their entirety.

## II. FACTS

### A. Relationship between ResCare and Alutiiq

ResCare is a company that provides unemployed individuals with developmental and job-training services. (Dkt. No. 41, ResCare's Statement of Facts ("SOF") ¶1-4.) Alutiiq contracts with the U.S. Department of Labor ("DOL") to perform contracts for Job Corps, which is a free education and career technical training program, administered by the U.S. Department of Labor for young people between the ages of sixteen and twenty-four. (Dkt. No. 41, ResCare's SOF 41 ¶3-6.) Alutiiq subcontracts with ResCare to operate a number of Job Corps centers, including the Westover Job Corps Center ("Westover") in Chicopee, Massachusetts. (Dkt. No. 38, Affidavit of Kim Addair ¶ 5; Dkt. No. 48-2, Westover Contract.)

ResCare's and Alutiiq's subcontracting agreement is memorialized in a contract ("Contract"), which was drafted by Alutiiq and signed by representatives of both parties.[3] (Dkt. No. 48-2, Westover Contract.) In this document, Alutiiq states that it will designate a "Director of the Center" ("Director"), which it defines as "the individual duly appointed by Alutiiq with responsibility and authority for planning, budgeting, directing, and operating the entire program at [Westover]." (Dkt. No. 48-2, Westover Contract 4.[4]) Pursuant to this contract, the Director's additional responsibilities include: establishing all "[c]enter disciplinary procedures" (Dkt. No. 48-2, Westover Contract 7);

[2] The court notes that Plaintiff originally initiated this action against Defendants in the Hampshire County Superior Court, Case No. HSCV2013-00096-A. (Dkt. No 11-3, State Court Record "Complaint" 3.) On August 20, 2013, Defendants removed the action to this court pursuant to 28 U.S.C. §§ 1332 and 1441. (Dkt. No. 1-1, State Court Record "Notice of Removal" ¶5.)

[3] These signing representatives were Robert P. Sabochick, Vice President of Alutiiq, and Richard L. Myers, Vice President of ResCare, Inc. (Dkt. No. 48-2, Westover Contract.)

[4] Record pincites correspond to page numbers assigned by this court.

approving all staff work schedules (Dkt. No. 48-2, Westover Contract 8-9); approving all requests for overtime (Dkt. No. 48-3, Overtime Approval form ("all overtime...must be approved in advance by the center director")); and approving all vacation requests. (Dkt. No. 48-4, Employee Leave Request.)

The Contract further holds all academic instructors responsible for enforcing "[a]ll safety rules and regulations of Alutiiq." (Dkt. No. 48-2, Westover Contract 8.) Additionally, though the contract purports to instill direct employee supervisory responsibility in ResCare, Alutiiq expressly reserves the right to "approve the hire and continued employment of [ResCare's] Supervisor level employees." (Dkt. No. 48-2, Westover Contract 6.)

### B. Plaintiff's Report

In November of 2011, Plaintiff was hired to work as an English teacher at Westover. (Dkt. No. 43-2, Asia Deposition 2-3, 14).[5] Kyle Burton ("Burton"), a ResCare employee, supervised Plaintiff from November of 2011 until he became ill in April of 2012. (Dkt. No. 39-1, Asia Deposition 6). At that point, Alex Compton ("Compton"), an Alutiiq Employee, supervised Plaintiff until the end of her tenure at Westover. (Dkt. No. 48-9, Asia Deposition 7.) Even prior to April of 2012, Compton's supervisory responsibilities included promulgating the "minimum standards" that Westover teachers, including Plaintiff, should demand from their students.[6] (Dkt. No. 48-7, Minimum Standards email.)

Plaintiff was assigned to instruct Student A[7] during the 2012 spring semester. (Dkt No. 43-2, Asia Deposition 5-6.) Plaintiff described Student A as a bright but insecure young lady, who "suffers from emotional issues" (Id. at 6; Dkt. No. 45-7, Plaintiff's Responses to ResCare's Interrogatories ¶12) and "was a very dramatic girl." (Dkt. No. 42-2, Asia Deposition 35.) On April 5, 2012, Student

---

[5] Throughout the entirety of her employment at Westover, Plaintiff received paychecks and health insurance from ResCare. (Dkt. 43-2, Asia Deposition 36.)
[6] Compton sent Plaintiff an email to this effect on March 20, 2012. (Dkt 48-7, Minimum Standards email.)
[7] The parties have not identified this individual because she was a minor during the events at issue in this case.

A gave Plaintiff a note (Dkt. No. 43-2, Asia Deposition 7-9) stating that she "wanted revenge," but that she would discuss the specific problem with Plaintiff after she returned from spring vacation. (Dkt. No. 43-2, Asia Deposition 7-11.) When school resumed on April 10, 2012, Student A approached Plaintiff and provided details about the incidents that prompted her to write the note. (Id. at 10-15.)

Student A told Plaintiff that she had been physically assaulted by the Westover Director, Cunesha Sanders ("Sanders"), on April 5, 2012. (Id. at 15.) Specifically, Student A claimed that after yelling at her to leave the bathroom, Sanders shoved her arm forcefully into Student A's chest and then slammed Student A into the wall. (Id.) Student A also told Plaintiff that later that same day, Sanders grabbed Student A's arm very firmly and yanked on her sweatshirt as they were both leaving the Westover building, and that Sanders then cornered Student A and pushed her into a glass wall. (Id.; Dkt. No. 43-4, Investigation Report 4.)

On April 11, 2012, Plaintiff called a "child abuse hotline" and recounted Student A's allegations. (Dkt. No. 45-19, Asia Deposition 3.) Plaintiff reports that the hotline counselor informed Plaintiff of her status as a mandated reporter within the meaning of MASS. GEN. LAWS ch. 119, § 51A,[8] and told her that she therefore had a statutory duty to report occurrences of possible child abuse to the DCF. (Id. at 3-4; Dkt. No. 45, Plaintiff's SOF ¶16.)

As a result of this phone call, Plaintiff reported Student A's comments to the DCF on April 11, 2013. (Id. at 4-5.) The DCF investigated the issue and concluded that it lacked sufficient evidence to take action. (Id. at 18-19.) Upon learning this, Plaintiff decided to call the Chicopee Police because she felt that it was "within [her] responsibilities as a mandated reporter."[9] (Id.)

---

[8] Neither party disputes Plaintiff's status as a mandated reporter under the applicable statute. See Mass. Gen. Laws ch. 119, § 21 (defining "mandated reporter").
[9] Plaintiff testified at her deposition that she believed that the Chicopee Police Department closed its investigation when Student A did not appear on her scheduled hearing date. (Dkt. No. 43-20, Asia Deposition 15.)

C.  **Action by Defendants**

On April 13, 2011, Robert Jackson ("Jackson"), a human resources manager working for Alutiiq (Dkt. No. 45-6, Defendant's Initial Disclosures 2), learned that Student A had reported the incident to Plaintiff. (Dkt. No. 43-4, Investigation Report 3.) After speaking with Plaintiff, Jackson concluded that an investigation would be necessary. (Id. at 5.) On April 14, 2012, human resources manager Karmen Earnheart ("Earnheart") informed Plaintiff that she would be suspended for five days with pay while Defendants conducted their own internal investigation of the allegations against Sanders, in order to "let things cool down."[10] (Dkt. No. 45-20, Asia Deposition 2-4.) Plaintiff did not wish to be suspended at this time. (Id. at 6.)

This investigation, conducted by Corporate Director of Human Resources, Mark Effinger ("Effinger"), and Jackson, took place between April 16, 2012 and April 20, 2012 and consisted of a series of interviews. (Dkt. 43-4, Investigation Report.) Since all allegations of inappropriate physical contact were denied by Sanders and Annette Grumt ("Grumt"), another teacher who had been present in the bathroom during the alleged incident,[11] (Dkt. 43-4 Investigation Summary) Jackson and Effinger ultimately concluded that the "allegations [were] unsubstantiated." (Dkt. 43-4, Investigation Report 8, 14-15, 21; Dkt. No. 45-12, Investigation Conclusions email.)

On May 1, 2012, Plaintiff told her Union Representative that she intended to report Student's A's allegations to the Chicopee Police. (Dkt. No. 45-7, Plaintiff's Responses to ResCare's Interrogatories ¶12.) Soon thereafter, Plaintiff was summoned to a meeting with Jackson and

---

[10] ResCare alleges that its "compliance plan require[d]" an investigation into this situation in its statement of facts (ResCare SOF ¶ 28), yet, as Plaintiff points out, ResCare has not submitted any evidence to substantiate this alleged fact. See Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by. . .citing to particular parts of materials in the record. . ."). Further, in its memorandum of law, ResCare indicates that its internal policies supported its decision to force Plaintiff to take paid administrative leave (ResCare's memorandum of law 13- 15) yet ResCare has not provided any evidence to support this assertion either.

[11] Plaintiff acknowledged in her deposition that she has no reason to believe that Grumt was being untruthful in her interview. (Dkt. No. 43-2, Asia Deposition 68.)

Compton.[12] (Dkt. 45-20, Asia Deposition 8-10.) In this meeting, they questioned Plaintiff about why she felt she needed to report the incident to the police. (Id.) Jackson also asked Plaintiff what could be done "to make her happy," which Plaintiff interpreted as an attempt to discourage her from contacting the Chicopee Police.[13] (Id. at 9.) The conversation concluded when Plaintiff told Compton and Jackson that she felt compelled to inform the Chicopee Police about Student A's allegations in order to "follow[] [her] duties as a mandated reporter." (Id.)

On May 4, 2012, Earnheart informed Plaintiff that she was again being suspended with pay for three days "to decide whether or not she could return to work on Thursday to perform her job and leave this student's situation alone."[14] (Id. at 20-21.) Plaintiff implored Earnheart to allow her to continue to work, but it was to no avail. (Id. at 21-22.) Earnheart further advised Plaintiff that "this [matter] was out of [Plaintiff's] hands," and that if Plaintiff continued to advocate for the student, then she "may be looking at corrective steps." (Id. at 21.) In this conversation, Earnheart also told Plaintiff that she was causing problems and that Alutiiq did not want her working at Westover anymore. (Id. at 29.) The evidence submitted does not indicate that any other employees were placed on administrative leave during or around these periods. (Dkt. No. 45-21, Asia Affidavit ¶5.)

Plaintiff served her second suspension with pay from May 7, 2012 to May 9, 2012.[15] (Dkt. No. 45-20 Asia Deposition 13, 19-22.) On May 8, 2012, Sergei Davidenkoff ("Davidenkoff"), a vice president of operations for ResCare (Dkt. No. 45, Plaintiff SOF ¶ 27), sent an internal email stating that "hr folks say that [ResCare doesn't] have enough to fire," and that "we will deal with this situation." (Dkt. No. 45-4, Davidenkoff email.) Additionally, Earnheart sent an email informing Davidenkoff and Compton that if Plaintiff does not resign, she would then "proceed with the plan

---

[12] Jackson and Compton told Plaintiff that "a little birdie" told them that she was thinking about reporting the incident to the Chicopee Police Department. (Dkt. No. 45-20, Asia Deposition 8-10.)
[13] Plaintiff did, however, acknowledge that Jackson and Compton told her that they were "not allowed to tell [her] that [she] should not contact the police." (Dkt. 45-20, Asia Deposition 9.)
[14] Plaintiff stated in her deposition that the word, "suspension may not have been used." (Id. at 21.)
[15] During Plaintiff's three day suspension, Student A was terminated from the Chicopee Job Corps program. (Id. at 14.)

to issue a Corrective Action regarding the reason [Plaintiff] was suspended." (Dkt. 45-8, Earnheart's Email to Davidenkoff and Compton.)

On May 10, 2012, Plaintiff resigned from her position at Westover. (Dkt. No. 45-7, Plaintiff's Responses to ResCare's Interrogatories ¶12). In her deposition, Plaintiff conceded that that: (1) she didn't recall anybody telling her that they were upset about the fact that she had filed a report; (2) "no one took any action against [her] in terms of changing the terms and conditions of [her] employment as a result of [her] filing [the] report"; and (3) that the decision to leave was made "unilaterally" after filing that report. (Dkt. No. 43-2, Asia Deposition 39.)

### III.    STANDARD OF REVIEW

Summary judgment is appropriate only when the pleadings and other submissions show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "All factual disputes and any competing rational inferences [should] be resolved in the light most favorable to the party opposing summary judgment." Ford v. Suffolk County, 154 F. Supp. 2d 131, 139 (D. Mass.2001) (internal quotations and citations omitted). The role of the trial judge at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Hodgens v. General Dynamics Corp., 144 F.3d 151, 167, (1st Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 244 (1986)).

### IV.    ANALYSIS

A.  **Whether Alutiiq Is Entitled to Summary Judgment**

Chapter 119's anti-retaliation provision only applies to employers. See MASS. GEN. LAWS ch. 119, § 51A(h) ("[n]o employer shall..." (emphasis added)). Alutiiq argues that it was not an employer and therefore it is entitled to summary judgment. The court disagrees.[16]

An entity's status as an employer typically hinges on whether it "has retained for itself sufficient control of the terms and conditions of employment of the employees" in question, Commodore v. Genesis Health Ventures, Inc., 824 N.E.2d 453, 456 (Mass. App. Ct. 2005), and whether it had the right to control and direct the means and manner in which those employees perform services. See Thomas O'Connor Constructors, Inc. v. Mass. Comm'n Against Discrimination, 893 N.E.2d 80, 85 n.8 (Mass. App. Ct. 2008); see also Deecy Prods. Co. v. Welch, 124 F.2d 592, 596 (1st Cir. 1941) ("it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so" (citation and quotation omitted)). Several factors should be considered in determining whether an entity is a joint employer, such as whether it: 1) supervises the employee's day-to-day activities, 2) has the authority to hire or fire employees, 3) promulgates work rules and conditions of employment, 4) controls work assignments, and 5) issues operating instructions. See Orell v. UMass Memorial Med. Center, Inc., 203 F. Supp. 2d 52, 62-63 (D. Mass. 2002); accord Commodore, 824 N.E.2d at 457 n.5.

Plaintiff has submitted sufficient evidence to show that a jury could find that Alutiiq was the Plaintiff's employer.[17] The Westover Contract states that an Alutiiq employee is responsible for

---

[16] The court notes the lack of Massachusetts courts' discussion regarding whether an individual constitutes an employer for the purposes of Mass. Gen. Laws ch. 119, § 51A. It is therefore necessary to derive guidance from courts' discussion of the definition of employer in other contexts. See Commodore v. Genesis Health Ventures, Inc., 824 N.E.2d 453, 457 (Mass. App. Ct. 2005) (looking to courts' discussions about the definition of employer in the context of other statutes for guidance).

[17] Alutiiq attempts to apply the Orell v. UMass Mem. Med. Ctr. framework to argue that it was not Plaintiff's employer because: (1) it played no role in the decision to hire Plaintiff; (2) Plaintiff was only supervised by Burton (a ResCare employee) while she worked at Westover; (3) ResCare set the terms and conditions of her employment; (4) Alutiiq played no role in setting or altering the terms and conditions of Plaintiff's employment or assigned her job responsibilities; (5) Plaintiff's pay checks came from ResCare; and (6) Alutiiq played no role in Plaintiff's decision to end her employment with ResCare. (Dkt. 37, Def't's Memo of law at 3) See 203 F. Supp. 2d 52, 62-63 (D. Mass. 2002). Alutiiq's arguments are unavailing, as Alutiiq's non-dispositive assertion that Plaintiff's paychecks were distributed by

"planning, budgeting, directing, and operating the entire program" (Dkt. No. 48-2, Westover

Contract 4), as well as approving staff work schedules and all requests for overtime and vacation.

(Dkt. No. 48-2, Westover Contract 8-9; Dkt. No. 48-3, Overtime Approval form; Dkt. No. 48-4,

Employee Leave Request.) See Commodore, 824 N.E.2d at 456 (control over terms and conditions

of employment). Plaintiff has also submitted evidence demonstrating that Alutiiq has at least some

authority over who may be hired to work at Westover. (Dkt. No. 48-5, Alutiiq's "Nepotism

Acknowledgement Notice" (Alutiiq's policy states that "[a]n immediate family member [of an

employee] may not be hired" unless certain conditions are met.)) See id. The record also suggests

that Compton, an Alutiiq Employee, directed and supervised Plaintiff's activities for at least a

portion of her employment. (Dkt. No. 48-7, "Minimum Standards" email; Dkt. No. 48-9, Asia

Deposition 7.) See Thomas O'Connor Constructors, Inc., 893 N.E.2d at 85 n.8 (control over

manner and means of services).

B. **Whether ResCare is entitled to Summary Judgment**

Under § 51A(h) of ch. 119, "[n]o employer shall discharge, discriminate or retaliate against a

mandated reporter who, in good faith, files a report under this section." MASS. GEN. LAWS ch. 119, §

51A(h) (any employer who does so shall be liable for damages). In order to establish a prima facie

case of retaliation, a Plaintiff must show "(1) he engaged in protected activity; (2) he suffered an

adverse employment action; and (3) the adverse employment action was causally related to the

protected activity."[18] Karatihy v. Commonwealth Flats Dev. Corp., 995 N.E.2d 819, 821-822 (Mass.

App. Ct. 2013). ResCare argues that it indisputably did not retaliate against Plaintiff, and that it is

therefore entitled to summary judgment because (1) Plaintiff did not engage in a protected activity;

---

ResCare is the only one of the six factors that the court credits. See Ford, 154 F. Supp. 2d at 139 (all disputes and competing rational inferences must be resolved in light most favorable to Plaintiff).

[18] Due to the lack of guidance regarding the elements of a retaliation claim under MASS. GEN. LAWS ch. 119, § 51A, the court will look to Massachusetts retaliation caselaw from other contexts. See, e.g., Weslstead v. Sturdy Memorial Hospital, 2000 WL 33541642, at *2 (Mass. Super. Ct. Nov 29, 2000) (analyzing retaliation under Massachusetts Fair Employment Practices Act, MASS. GEN. LAWS ch. 151B).

(2) ResCare did not take any adverse employment actions against Plaintiff, nor did it constructively discharge her;[19] (3) ResCare's actions regarding Plaintiff were taken for legitimate purposes; and (4) Plaintiff failed to mitigate damages.[20] ResCare's arguments are unavailing.

(1) <u>Whether Plaintiff engaged in a protected activity</u>

ResCare asserts that ch. 119, § 51A(a) requires a mandated reporter to perform an independent investigation or credibility evaluation prior to reporting allegations to the DCF. Accordingly, ResCare argues it is entitled to summary judgment because Plaintiff lacked "reasonable cause to believe" that Student A was at risk of suffering substantially serious injury. <u>See</u> MASS. GEN. LAWS ch. 119, § 51A(a) ("mandated reporter who. . .has reasonable cause to believe that a child is suffering. . ."). In short, ResCare reads subsection (a) to impose an obligation upon a mandated reporter that, in the court's view, does not exist. <u>See</u> <u>id.</u>

In order to qualify for immunity from retaliation under the statute, the sole obligation imposed upon a mandated reporter is that she file her report in "good faith." <u>See</u> MASS. GEN. LAWS ch. 119, § 51A(h) ("No employer shall discharge, discriminate or retaliate against a mandated reporter who, in good faith, files a report under this section."). Moreover, both cases upon which ResCare's relies to support its erroneous interpretation are distinguishable from the instant case.

First, <u>Cobble v. Comm'n of Dep't of Social Services</u>, evaluates the legitimacy of a decision by the Department of Social Services ("DSS")[21] to "support[] [a] report of abuse and neglect."[22] 719

---

[19] Since Plaintiff does not have to prove constructive discharge as a part of her prima facie burden, the court will not address this argument. <u>See</u> <u>Karatihy v. Commonwealth Flats Dev. Corp.</u>, N.E.2d 819, 821-822 (Mass. App. Ct.2013) (providing prima facie elements of retaliation claims).

[20] ResCare conceded the mitigation of damages issue for the purposes of summary judgment at the October 29, 2014 motion hearing. <u>See</u> <u>Sheriff of Suffolk County v. Jail Officers & Emples.</u>, 990 N.E.2d 1042, 1049 (Mass.2013) (former employer bears the burden of proof to show that former employee did not sufficiently mitigate damages following discharge). Therefore, the court will not address this argument.

[21] The Massachusetts Department of Social Services became the Massachusetts Department of Children and Families in 2008. MASS. GEN. LAWS ch. 176, § 79 (2008).

[22] A DSS decision to "support" a report entails a finding that it has reason to believe that an incident of child abuse or neglect has occurred, and that some caretaker is responsible. <u>See</u> <u>Cobble v. Comm'n of Dep't of Social Services</u>, 719 N.E.2d 500, 502, 506 (Mass.1999).

N.E.2d 500, 504 (Mass.1999). Though the Supreme Judicial Court ("SJC") ultimately found that the requisite "facts, knowledge or observations" did not support the DSS's finding that it had "reasonable cause to believe" that there was a substantial risk of physical injury, the SJC's legal determination pertained to the DSS's investigation, and not to the original reporter's decision to report the allegations to the department. See id. at 502 n.3, 508.

ResCare's reliance upon Guardia v. Clinic and Support Options, Inc. is similarly unavailing. The Guardia plaintiff, an out-patient therapist, did not actually file a 51A report, as did Plaintiff in the instant case. See 2014 WL 2600171, *1-2 (D.Mass. June 3, 2014). Instead, when a DCF attorney directly asked the Guardia plaintiff if she "had any concerns" about one of her client's ability to be a parent, the plaintiff answered in the affirmative because the client was in "early recovery" and the plaintiff "usually recommends to such clients that early recovery be made their priority." Id. at *2. The plaintiff then underwent adverse employment action because she "had disclosed [this] information. . .to DCF without a proper release." Id. at *3. Explaining that the anti-retaliation provisions of ch. 119 do not apply when a report under the statute has not been made, the Guardia court granted summary judgment for the plaintiff's employer. Id. at *10.

### (2) Whether ResCare took Adverse Employment Action against Plaintiff

ResCare also contends that the employment action taken against Plaintiff was not sufficiently adverse to satisfy the second element of Plaintiff's prima facie case. The court disagrees on several grounds, any one of which could be deemed dispositive.

As a preliminary matter, ResCare contends that its decision to place Plaintiff on the first mandatory paid administrative leave was supported by its own internal policies. (Dkt 41, ResCare's SOF ¶28; Dkt. No. 42, ResCare's memorandum of law 13- 15.) ResCare has, however, failed to

present any evidence that could be viewed as support for that purported justification.[23] Even if

ResCare had produced such documentation, however, it would still fail to satisfy its burden.[24]

The Supreme Court has held that adverse employment action can be inferred from action

that might have dissuaded a reasonable employee from engaging in statutorily protected conduct.[25]

Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006); accord

Ngassa v. Ocean State Job Lot Stores of Se MA, Inc., 26 Mass. L. Rep. 499 *7 (Mass. Super. Ct.

2010). In light of the Burlington Northern & Santa Fe Ry. v. White standard, the record contains

considerable evidence from which a jury could infer that Plaintiff's two mandatory administrative

leaves rise to the level of adverse employment action, especially when they are viewed in the

aggregate. See 548 U.S. at 68.

Most significantly, Plaintiff was placed on administrative leave twice, thereby factually

distinguishing the instant case from those cited by ResCare to support the proposition that one paid

administrative leave, on its face, is not sufficiently adverse. See, e.g., Colon v. Infotech Aero. Servs.,

869 F. Supp. 2d 220, 230 (D.P.R.2012) (placing plaintiff on one administrative leave was not an

adverse employment action). ResCare's purported justification for the first leave, specifically that

internal policy mandated that Plaintiff be placed on administrative leave during the investigation,

cannot also explain away the second administrative leave because ResCare's investigation had ended

---

[23] In fact, during oral argument, Plaintiff indicated that she had requested documentation from ResCare to support this assertion, but that ResCare has not provided any. The court questioned ResCare on this subject at the hearing, and it responded that it did not know whether this assertion was actually supported in any existing documentation. ResCare further surmised that this type of action is standard procedure for these situations regardless of whether it is memorialized in a written policy.

[24] Among other reasons to reject ResCare's argument, the court is skeptical that an internal policy would mandate that an incident's reporter be put on administrative leave during an internal investigation; but would not similarly mandate that the alleged perpetrator be put on administrative leave as well. Even if such a ResCare policy did exist, disparate treatment between similarly situated individuals permits the inference that a given employment action was adverse. See Colón v. Tracey, 717 F.3d 43, 50 (1st Cir. 2013) (court looked to whether similarly situated individuals experienced the employment action in question in order to determine whether it was adverse).

[25] In light of Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006), the court rejectsResCare's proposition that adverse employment actions are limited to situations in which an employer literally takes something of consequence from an employee, "including a reduction in salary, a discharge, or divesture of significant responsibilities." (Dkt. No. 42, Rescare's memorandum of law (citing Blackie v. State of Me., 75 F.3d 716, 725 (1st Cir. 1996))).

by the time that Plaintiff's second administrative leave had begun. (Dkt. No. 45-12, Investigation Conclusions email (investigation completed on April 20, 2012); Dkt. 45-20, Asia Deposition 20-21 (Earnhearnt informed Plaintiff she would be placed on a second administrative leave on May 4, 2012)) <u>See</u> <u>Burlington Northern & Santa Fe Ry.</u>, 548 U.S. at 68.

Moreover, a jury could infer that the actions were adverse because of the temporal proximity between the point at which Plaintiff told Jackson and Compton that she planned to report the allegations to the Chicopee Police, and the point at which Earnheardt informed Plaintiff that she would be placed on a second administrative leave. (Dkt. No. 45-20, Asia Deposition 8-10, 20-21) <u>See</u> <u>id.</u> This inference is also supported by the evidence of threats regarding the continuing ramifications of Plaintiff's protected conduct,[26] as well the evidence indicating that Plaintiff's employers did, in fact, consider these "suspension[s]" to be disciplinary.[27] <u>See</u> <u>id.</u>

### (3)  <u>Whether Rescare's actions were taken for legitimate purposes</u>

ResCare argues it is entitled to summary judgment because it "had legitimate, legal reasons for requesting that Asia take administrative leave." (Dkt. No. 42, ResCare's memorandum of law 13-15.). However, the question of ResCare's true motive should be resolved by a factfinder. <u>See</u> <u>Blare v.</u> <u>Husky Injection Molding Sys. Boston</u>, 646 N.E.2d 111, 114 (Mass.1995) ("The ultimate question of the defendants' state of mind is elusive and rarely is established by other than circumstantial evidence, which requires the jury to weigh the credibility of conflicting explanations of the adverse" employment action. (internal citation omitted)); <u>see also</u> <u>Koss v. Palmer Fire Dist. No. One</u>, 2014 WL 5302958, at *8 (D. Mass. Oct. 15, 2014) (when evaluating an employer's true intention, "there is

---

[26] For example, on May 4, 2012, Earnheart advised Plaintiff that "this [matter] was out of [Plaintiff's] hands and she had been an advocate to the student, but now she needed to stay the course with her job. And if not, [the Plaintiff] may be looking at corrective steps." (Dkt 45-20, Asia Deposition 21.)

[27] For example, on May 8, 2012, Earnheart sent an email informing Davidenkoff and Compton that if Plaintiff does not resign, she would then "proceed with the plan to issue a Corrective Action regarding the reason [Plaintiff] was suspended." (Dkt. 45-8, Earnheart's Email to Davidenkoff and Compton.)

reason to be concerned about the possibility that [the] employer could disguise its impermissibly-motivated adverse employment action under a veil of permissible cause").

At the summary judgment stage, a high degree of temporal proximity between protected conduct and adverse employment action suffices to permit the inference of a causal connection between the two. See Mole v. Univ. of Mass., 814 N.E.2d 329, 339 (Mass.2004) (if adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, an inference of causation is permissible). In its brief, ResCare concedes that "temporal proximity can create an inference of retaliation," but also seems to contrastingly argue that temporal proximity is not sufficient to defeat a motion for summary judgment. (Dkt. 42, ResCare's memorandum of law 14 (emphasis added)). The court credits ResCare's concession in light of the applicable standard. See Ford, 154 F. Supp. 2d 131, 139 (D. Mass.2001) (rational inferences resolved in favor of non-moving party (emphasis added)); See Mole, 814 N.E.2d at 339.

Here, there was a high degree of temporal proximity between both of Plaintiff's mandatory leaves and the two instances in which she engaged in protected conduct. See MASS. GEN. LAWS ch. 119, § 51A (communication to both the DCF and "local law enforcement authorities" is protected); Mole, 814 N.E.2d at 339. Accordingly, a reasonable jury could conclude that the mandatory administrative leaves were retaliatory. See id.

ResCare also argues that it "requested that [Plaintiff] take administrative leave because there was a question as to whether she properly followed [Defendants'] policies." (Dkt. 46, ResCare's memorandum of law 14.) Even if the court assumes, arguendo, that these alleged policies exist, ResCare's argument is unavailing because ch. 119 explicitly forbids employers from retaliating against mandated reporters who file reports. See MASS. GEN. LAWS ch. 119, § 51A. Therefore, the

fact that an employee has an internal policy that is inconsistent with ch. 119 does not eliminate the statute's anti-retaliation provision. See id.

## V. CONCLUSION

For the reasons set forth above, when the evidence is viewed in the light most favorable to Plaintiff, Defendants' arguments in support of their respective motions for summary judgment are unavailing. Accordingly, Defendants' motions for summary judgment (Dkt. Nos. 35 and 40) are DENIED in their entirety.

It is So Ordered.


 _/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge